IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 17, 2001

## STATE OF TENNESSEE v. KENNETH L. BOGGS

**Appeal from the Criminal Court for Davidson County**
**No. 99-B-1205     Seth Norman, Judge**

---

**No. M2000-02724-CCA-R3-CD - Filed December 14, 2001**

---

The defendant, Kenneth L. Boggs, appeals his Davidson County Criminal Court conviction of unlawful possession of a handgun, a Class E felony. He complains on appeal that the trial court erred in not addressing the prosecutor's exploitation of the defendant's exercise of his right to remain silent following his arrest. Finding no error requiring reversal, we affirm the conviction.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Sam E. Wallace, Jr., Nashville, Tennessee, for the Appellant, Kenneth L. Boggs.

Paul G. Summers, Attorney General & Reporter; Mark E. Davidson, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Jason W. Lawless, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In 1998, the defendant was employed by Charter Corporation to transport persons to medical facilities for dialysis and other treatments. Charter provides "handicap transportation" services and in 1998 maintained a fleet of 25 to 30 vans. Driving his assigned van, the defendant began hauling dialysis patients very early on the morning of December 27, 1998. After delivering passengers to the appropriate medical facilities and while the van was empty, the defendant "took a break" at mid-morning to visit his ailing grandfather, who lived on a narrow street near the defendant's previous destination. The defendant parked the Charter van partly on the sidewalk and partly in the street in front of the house.

The defendant testified that as he was returning to the van after the visit a man whom he knew as Michael called to him. The defendant testified that he started the van and pulled into the street, where he stopped to talk to Michael.

A patrolling Metro police officer testified that he saw the van blocking the street and testified that three young black males were clustered around a window of the van. As the officer approached the van, the young men scattered, and the van moved into an intersecting street. The defendant testified that only Michael, who wanted money to buy wine, came up to the van. The defendant testified that he declined Michael's request and began to drive away before he saw the policeman.

At any rate, all agree that as the van pulled into the intersecting street, the officer activated his blue lights and stopped the defendant. The officer warned him about blocking the street and asked to see the defendant's license. Despite the defendant having a proper license, the officer asked the defendant for permission to search the van.[1] The officer found a loaded pistol underneath the driver's seat.

The officer then arrested the defendant for possession of the handgun, handcuffed him, and placed him in the police cruiser. The officer testified that he "Mirandized" the defendant and that "sometime in between while [he] was doing the arrest report" in the cruiser, the defendant stated that he kept the pistol for protection because of the dangerous neighborhoods in which he worked.

The defendant testified that the gun did not belong to him and that he did not know that it was in the van. He testified that he did not recall the officer reading him his "rights." Thereafter, he testified on direct examination as follows:

Q       Do you recall him asking you any questions?
        . . .
A       As far as about the weapon, no, sir.
Q       Did you make any statements about the weapon?
A       No, sir.
Q       Is he accurate, was his memory correct when he says that you told him you had it for protection?
A       No, sir.

The state then cross-examined the defendant as follows:

Q       So you didn't say, that's my gun, don't arrest me?
A       I didn't say anything.
Q       Why did you not tell him it wasn't your gun?
A       Why was I supposed to say something?
Q       You were going to jail, weren't you?
A       Why was I supposed to say something?
Q       You were going to jail, weren't you?

[1] The defendant conceded at trial that he gave the officer permission to search.

A        I still got arrested.

The defendant's attorney then objected to "improper question[s]," based upon the defendant's right to remain silent. The trial court observed that the defendant had not yet answered the state's question and overruled the objection. The state resumed its cross-examination:

Q        So you did not say anything to the police officer to help yourself?
A        What am I guilty of?
Q        He accused you of possession a weapon, didn't he?
A        That's just accusing, that doesn't make me guilty.
Q        And he put cuffs on you?
A        That doesn't make me guilty.
Q        He took you down to jail, didn't he?
A        It still doesn't make me guilty.
Q        And you never bothered to say, that's not my gun, it's somebody
         else's?
A        That still doesn't make me guilty.
Q        Do you know whose gun it is?
A        No, sir, I do not.

The prosecutor then questioned the defendant about whether the neighborhoods in which he worked are dangerous, and then he asked the defendant whether he told the officer that he had to work in "bad neighborhoods" and that he carried the gun for protection. The defendant denied making these statements.

Following the defendant's testimony, he called as a witness Rodney Davis, Charter Corporation's director of transportation. Mr. Davis, who had been the defendant's supervisor on December 27, 1998, testified that on that morning the defendant picked up the van at the Charter lot. On cross-examination, however, Mr. Davis revealed that the defendant probably had driven the same van in the days preceding December 27, that the company had a "no weapons" policy, and that, after the defendant's arrest, the defendant claimed ownership of the pistol.

During the state's closing argument, the prosecutor argued that the defendant had admitted to the officer and to Mr. Davis that the defendant owned the gun. The prosecutor further argued as follows:

> You heard the defendant get on the stand and say, I didn't say anything to him. You heard him, he was defensive on the stand, apparently, didn't want me to ask any questions about it, didn't want to answer my questions, even simple questions . . . . And when you apply the facts of what the officer said compared to what the defendant said, and the law, . . . I think it's a straightforward case.

. . .

>[The defendant] claims to remember everything, not speaking to the officer, not saying it's not my gun, not saying anything, which is his right, he doesn't have to say anything.

The defendant did not object to these portions of the state's argument.

The jury was instructed to deliberate on the issue of the defendant's guilt of possessing a handgun as charged in the first count of the indictment. After they returned a verdict of guilty, the state offered into evidence via the court clerk a certified copy of the defendant's 1990 voluntary manslaughter conviction. The court then charged the jury to consider whether the defendant possessed a handgun while being previously convicted of a "felony involving the use or attempted use of force, violence or a deadly weapon," as charged in the second count of the indictment. *See* Tenn. Code Ann. § 39-17-1307(b) (1997). The jury also returned a verdict of guilty of this latter count. The trial court imposed a conviction of the Class E felony under Code section 39-17-1307(b) and after a sentencing hearing, imposed a Range I, two-year community corrections sentence.

The sole issue raised on appeal is whether the state improperly exploited the defendant's exercise of his right to remain silent following his arrest and whether the lower court erred in allowing the improper use of the information and in failing to afford a meaningful remedy. We hold that the lower court erred but that the error was harmless beyond a reasonable doubt.

It is well settled that a defendant generally may not be penalized at trial for the exercise of his constitutional right to remain silent after arrest. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 2245 (1976); *Braden v. State*, 534 S.W.2d 657, 661 (Tenn. 1976); *State v. Christopher Lamont Kelso*, No. E2000-01602-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Knoxville, June 18, 2001); *State v. Mabe*, 655 S.W.2d 203, 205 (Tenn. Crim. App. 1983). Accordingly, the prosecution should neither comment on a defendant's post-arrest silence nor use it to impeach a defendant's testimony during trial. *See Braden*, 534 S.W.2d at 660; *Mabe*, 655 S.W.2d at 205; *Ware v. State*, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978); *Honeycutt v. State*, 544 S.W.2d 912, 917 (Tenn. Crim. App. 1976). Otherwise, as explained in *Braden*, a defendant "would have to assert his innocence immediately or not at all, except at the peril of having the prosecution using his initial silence against him." *Braden*, 534 S.W.2d at 660. Such an approach "would have a chilling effect on a defendant's assertion of his constitutional right to remain silent and, consequently, cannot be permitted." *Id*. *But cf. Doyle*, 426 U.S. at 611, n. 11, 96 S. Ct. 2241, n. 11 (distinguishing the impeachment situation from the situation where the defendant "testifies to an exculpatory version of events and claims to have told the police the same version upon arrest," so that state's claim of post-arrest silence is not being offered for impeachment purposes but "to challenge the defendant's testimony as to his behavior following arrest").

A violation of the rule prohibiting references to the defendant's exercise of his right to stand silent in the face of accusation does not necessitate a reversal of a conviction if the error is harmless beyond a reasonable doubt. *Mabe*, 655 S.W.2d at 205; *Honeycutt*, 544 S.W.2d at 917-18. This court previously has compared the gravity of the error with the strength of the state's case in determining whether the error is harmless beyond a reasonable doubt. *See Mabe,* 655 S.W.2d at 205; *State v. Crawford*, 620 S.W.2d 543, 546 (Tenn. Crim. App. 1981); *Honeycutt*, 544 S.W.2d at 918.

At the outset, we must determine the effect of the defendant's failure to object to the prosecutor's argument to the jury about the defendant's post-arrest silence. Usually, the failure to object equates to a waiver of appellate review. *See* Tenn. R. App. P. 36(a); *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999). On the other hand, the appellate court has wide discretion to notice plain error. *State v. Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); *see* Tenn. R. App. P. 13(b). In the present case, the state's argument to the jury is a palpable extension of its cross-examination of the defendant on the issue of the defendant's silence in the face of accusation, and we believe that substantial rights of the defendant and prejudice to the judicial process are implicated by the use of the post-arrest silence information *as a whole.* See Tenn. R. App. P. 13(b); Tenn. R. Crim. 52(b); *Adkisson*, 899 S.W.2d at 641 (guidelines for exercising appellate discretion to notice plain error include need to "do substantial justice," and court should determine whether the error "undermined the fundamental fairness of the trial"). Thus, we will consider the prosecutor's comments during his argument to the jury as a part of the claim that the state improperly used this information about the defendant's post-arrest silence.

In the defendant's direct testimony, he denied that he told the arresting officer that he possessed the gun; however, this testimony was designed to rebut the officer's prior testimony to the contrary. Even though the defendant's counsel asked him whether he made "any" statements about the gun, that question and the defendant's negative response must be fairly understood to rebut the officer's claim that the defendant had admitted possession of the gun. We conclude that the defendant was entitled to take issue with the officer's assertion that a post-arrest confession had been made without thereby "opening the door" to being cross-examined about his silence in the face of accusation.

After the defendant denied during direct examination that he made a post-arrest statement, clearly the state was free to cross-examine him about whether he *made the statement* attributed to him by the officer. *See Gray v. State*, 250 S.W.2d 86, 92 (Tenn. 1952) (defendant in criminal case who takes the witness stand is "subject to the same methods of cross-examination as an ordinary witness"); *Brook v. State*, 213 S.W.2d 7, 10 (Tenn. 1948). To accomplish this, however, the state must posit that the defendant *made* the post-arrest statement. The prosecutor, however, did not constrain himself to this objective. Instead, through intensive questioning about the defendant's post-arrest silence, the prosecutor posited that, if the defendant *did not make* the post-arrest statements, the silence contradicts the defendant's trial version of the offense that he had no knowledge of the gun. This cross-examination is nothing more than an attempt to use the defendant's silence in the face of accusation to impeach his direct testimony. Moreover, the prosecutor's argument urged the jury to discredit the defendant because of his silence and because

he was "defensive" in being questioned about his silence. Certainly, the defendant has a right based in the Fifth Amendment and Due Process to be defensive in the face of these questions. Not only did the state attempt to skewer the defendant on a guilty-by-silence prong, but it also attributed to him guilt based upon his justified oppugnance to the prosecution's questions.

Consequently, we conclude that the prosecutor should not have pursued this line of questioning and argument, and that, after the defendant objected to the cross-examination, the trial court erred in not sustaining the objection and in not effecting some remedy. It is unavailing to the state that the trial judge deflected the defendant's objection by observing that the defendant had not yet answered the questions about why he had not asserted his innocence when arrested. To avoid a "chilling effect on a defendant's assertion of his constitutional right to remain silent," *Braden*, 534 S.W.2d at 660, the courts should protect a defendant's right to remain silent by assuring that the state not *use* this silence against him. *See Doyle*, 426 U.S. at 619, 96 S. Ct. at 2245. To that end, the state should not be allowed, by posing questions, to suggest or imply that the defendant remained silent because he was guilty or that his current version of the events was fabricated. Whether the defendant answered well -- or answered at all -- is immaterial to the inquiry of whether the ban on *use* of the post-arrest silence has been violated. In the present case, the trial court erred in overruling the defendant's objection and in denying a suitable remedy.

We must now determine the effect of the errors below. On the one hand, we are cognizant of the fact that not only did the prosecutor cross-examine the defendant about his post-arrest silence and did so at some length, but he also compounded the problem by commenting upon the post-arrest silence in his argument to the jury. In his argument, he invited the jury to compare the testimony of the arresting officer with that of the defendant and to conclude that the defendant's post-arrest silence discredited his testimony and demonstrated guilt.

On the other hand, when we compare the egregiousness of the error with the strength of the state's case, we see that the state did not rely solely upon the arresting officer's testimony to establish that the defendant admitted ownership of the gun. The defendant's job supervisor -- the defendant's own witness -- testified that the defendant admitted to him that he owned the gun. We conclude that this evidence would have assured a guilty verdict had the improper information about the defendant's post-arrest silence not been inserted into the case. Thus, we conclude that, even though the improper use of evidence of the defendant's silence in the face of accusation affected his substantial rights and threatened the integrity of the judicial process, it was nevertheless harmless error beyond a reasonable doubt. The errors, even in combination, do not appear to have affected the judgment. *See* Tenn. R. App. P. 36(b).

This being the only issue raised on appeal, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-6-