# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 10, 2009

## STATE OF TENNESSEE v. JOSEPH POLLARD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-04223     John P. Colton, Jr., Judge**

---

**No. W2008-02436-CCA-R3-CD   -   Filed May 11, 2010**

---

A Shelby County jury found the defendant, Joseph Pollard, guilty of first degree murder, attempted voluntary manslaughter, a Class D felony, and aggravated assault, a Class C felony.  He received a life sentence for his first degree murder conviction, two years as a standard offender for attempted voluntary manslaughter, and three years as a standard offender for aggravated assault, to be served concurrently in the Tennessee Department of Correction.  On appeal, the defendant argues that the evidence was insufficient to support a first degree murder conviction and that the trial court erred in dismissing his motion for mistrial.  Following our review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Harry E. Sayle III  (on appeal), Robert Wilson Jones, District Public Defender, and Latonya Burrow and Robert Gowen, Assistant Public Defenders (at trial), Memphis, Tennessee, for the appellant, Joseph Pollard.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen Baity and Alexia Fulgham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

In March 2006, a Shelby County grand jury indicted the defendant, Joseph Pollard, on three counts: (1) the first degree murder of Katrina Hayes, (2) criminal attempt to commit the first degree murder of A.H.,[1] and (3) the aggravated assault of A.H. The state amended the second count to attempted voluntary manslaughter. A trial commenced on July 28, 2008. From the trial, we summarize the following testimony.

*State's Proof.* The victim's daughter, K.H.,[2] testified that on September 21, 2005, she had been to church and her grandmother's house with the victim and her younger brother, A.H. The family had just pulled into their carport at home when the victim's former boyfriend, the defendant, pulled into the driveway behind them, blocking them in the carport. He came up to the victim's door and demanded that she get out of the car and "stop f---ing with him." K.H. saw a gun in his hands. The victim pleaded with him and told her children to run. As K.H. and her brother were getting out of the car and running away, she heard three shots. She and her brother ducked behind the defendant's car, but then her brother ran across the yard, and the defendant fired a shot at him. They both began running down the street, and the defendant got into his car and drove away in the opposite direction. K.H. called 911 and was present when the paramedics arrived and began working on the victim. K.H. testified that the victim had dated the defendant for approximately one year, but she had ended the relationship the week prior to her death because the defendant began using crack cocaine.

On cross-examination, K.H. agreed that she originally told police that she did not see the gun.

A.H. corroborated K.H.'s testimony. Additionally, he testified that the defendant had driven past their house, but he backed up and then pulled into their driveway behind their car, a green van. A.H. was not injured when the defendant shot at him. He said that the defendant had begun acting differently leading up to when the victim ended her relationship with him.

Officer Trent Matthew Pinks, a patrolman with the Memphis Police Department, responded to a shooting call on September 21, 2005. When he arrived at the victim's house, the victim was lying in a pool of blood on the ground next to her van. She was able to tell him what happened. He observed two bullet casings near her, and he testified that the paramedics found a spent bullet lodged in her clothing when they cut off her clothing.

---

[1] It is the policy of this court to refer to minors by their initials.

[2] While K.H. was eighteen years old at the time of trial, she was a minor at the time of the offenses.

On cross-examination, Officer Pinks testified that the victim was alert when he arrived and was in non-critical condition when the ambulance transported her.

Officer Jonathan O'Malley Jones, a patrolman with the Memphis Police Department, was the first to respond to the victim's residence on September 21, 2005. He spoke with the victim and collected one bullet that he found near the victim, which he tagged as evidence.

Officer Marlon Wright, with the Memphis Police Department's Crime Scene Investigation Unit, photographed the scene at the victim's residence after she had been transported to the hospital. He also retrieved two .45 caliber casings from the driveway, by the driver's side of the van, and tagged them as evidence.

Deputy Robert L. Harper, Jr., of the Shelby County Sheriff Department's Fugitive Division, testified that he went to 1180 Agnes Place on September 22, 2005 to arrest a female. He did not find the female, but he received permission to search the residence. He heard voices in the attic of the house, behind a door. Accompanied by his sergeant, he kicked in the door. Upon entering the room, he took a male subject into custody. He then observed another male behind some curtains who was raising a "shiny object" from his right side. Deputy Harper grabbed the man's wrist and ordered him to drop his weapon, a Ruger pistol. The man complied, and Deputy Harper took him into custody. Other officers recovered the pistol. Deputy Harper learned that the man with the pistol was the defendant, and he had an outstanding arrest warrant. He transported the defendant to Memphis Police Department's Homicide Division. Deputy Harper testified that the pistol was loaded, and he turned the weapon over to the Memphis Police Department.

On cross-examination, Deputy Harper testified that his partner, his sergeant, and two other deputies accompanied him when he searched the residence at 1180 Agnes Place. An elderly woman who lived at the residence gave her permission for them to search.

Sergeant Caroline Mason, of the Memphis Police Department's Homicide Division, testified that she received a call on September 22, 2005, that the defendant was in custody at the homicide office at 201 Poplar Avenue. She and Sergeant Russell Maness attempted to interview the defendant in an interview room. She explained why he was in custody and that she wanted to speak with him. Sergeant Mason read the defendant his *Miranda* rights, and he indicated that he understood his rights. He refused to provide a statement and asked for a lawyer. He also told her "that he had seriously messed up" and "that [she] knew very well that he didn't need to give a statement because his butt was going to rot in jail." She did not question him further.

On cross-examination, Sergeant Mason testified that the defendant read his *Miranda* rights, but he did not read them aloud. He did not sign anything.

Dr. Karen E. Chancellor, the Shelby County Medical Examiner, testified that the victim received two gunshot wounds. One entrance wound was located on the left side of the victim's abdomen. The bullet passed through her body, damaging blood vessels, internal organs and bones, and exited through her left buttock. The second entrance wound was located on the back of the victim's right arm. The bullet broke the bones in the arm and exited through the front of the arm. Dr. Chancellor testified that the gunshot wound to the victim's abdomen caused hemorrhaging that resulted in her death.

On cross-examination, Dr. Chancellor testified that the victim was in exploratory surgery for three hours after the shooting. The surgeons estimated that she lost twelve liters of blood. Dr. Chancellor said that the normal human body holds five liters of blood. Dr. Chancellor testified that both of the victim's wounds were perforated, meaning the bullet exited the body.

Sergeant Russell Jeffery Maness testified that he worked this case with Sergeant Mason. Sergeant Maness took possession of the weapon and ammunition that the sheriff's deputies brought in with the defendant. He placed a Ruger semi-automatic handgun, a magazine with five live .45 caliber rounds, a plastic bag containing seven live .45 caliber rounds, and one loose .45 caliber round in the property room.

Thomas Shouse, an investigator with the District Attorney General's office, testified that he retrieved a .45 caliber automatic pistol with a magazine and thirteen bullets and a .45 caliber fired jacketed bullet from the state's property room and transported them to the Tennessee Bureau of Investigation for testing.

Agent Alex Brodhag, a firearms examiner for the Tennessee Bureau of Investigation's Forensic Services Division, testified that he examined a .45 caliber automatic pistol, two fired .45 caliber cartridge shells, and one .45 caliber fired jacketed bullet. Agent Brodhag test-fired the pistol with rounds from a reference collection of ammunition and compared the test-fired bullets and shells with the shells and bullet he received. He determined that the examined pistol fired the bullet and shells received from the Memphis Police Department, to the exclusion of all others.

On cross-examination, Agent Brodhag testified that the pistol's magazine could hold eight rounds. With an additional round in the pistol's chamber, the pistol could hold nine rounds total.

*Defense Proof.* Dr. O'Brian Cleary Smith, a forensic pathologist and former Shelby County Medical Examiner, testified that one .45 caliber round would have been capable of causing both of the victim's gunshot wounds by entering and exiting her arm and then

-4-

entering and exiting her torso. He further testified that the victim expired approximately two hours after arriving at the Regional Medical Center.

On cross-examination, Dr. Smith said that it was possible that two bullets caused the victim's wounds. He did not disagree with the victim's cause of death.

After the close of proof and deliberations, the jury returned its verdicts finding the defendant guilty of first degree murder, attempted voluntary manslaughter, and aggravated assault. The trial court sentenced the defendant to life with the possibility of parole for first degree murder, two years for attempted voluntary manslaughter as a Range I standard offender, and three years for aggravated assault as a Range I standard offender, with all sentences to run concurrently. The defendant made a motion for new trial, which the court denied. Subsequently, the defendant filed a timely notice of appeal.

**Analysis**

*I. Sufficiency of the Evidence*

On appeal, the defendant challenges the sufficiency of the evidence to support his first degree murder conviction.[3] The defendant "does not dispute that he fired the bullet that struck [the victim]." He contends that the evidence was insufficient to prove premeditation because of Dr. Smith's testimony that one bullet could have caused all of the victim's injuries and because K.H. and A.H. testified that they were not watching when the defendant shot the victim. The state responds that the evidence was sufficient to sustain the conviction. We agree with the state.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn

---

[3] The defendant does not challenge the sufficiency of the evidence to support his convictions for aggravated assault and attempted voluntary manslaughter.

from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewed in a light most favorable to the state, the evidence at trial established that the defendant, armed with a .45 caliber Ruger pistol, drove to the victim's house and blocked her in her driveway. He demanded that she get out of the car and fired three shots, at least one of which struck the unarmed victim, causing her to hemorrhage, which resulted in her death several hours later. The defendant fired a shot at the victim's son, who was running away from him. The defendant then drove away in his car. The evidence further revealed that the victim ended her year-long relationship with the defendant one week prior to her death. The

defendant's actions in driving to the victim's house armed with a pistol, shooting the unarmed victim in front of her children and driving away, as well as the history between the defendant and the victim, support a finding of an intentional and premeditated killing. In our view, a rational jury could infer that sufficient evidence existed to support the defendant's conviction. The defendant is, therefore, without relief as to this issue.

*II. Motion for Mistrial*

The defendant challenges the trial court's denial of his motion for mistrial based on the prosecutor's allegedly improper comment on the defendant's pre-trial silence during closing arguments. The state responds that because the defendant was not silent before trial, the prosecutor's comment was not improper, and the trial court did not abuse its discretion in denying the defendant's motion for mistrial. We agree with the state.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold*, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land*, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.*

The scope of closing argument is subject to the trial court's discretion and will not be reversed absent a clear showing of abuse of discretion. *See State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998); *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). It has long been recognized that closing argument is a valuable privilege that should not be unduly restricted. *See State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). However, closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). When determining whether an improper argument constitutes reversible error, this court considers whether the conduct was so improper or the argument so inflammatory that it prejudicially affected the jury's verdict. *See Middlebrooks*, 995 S.W.2d at 559.

It is well established that a defendant may not be penalized at trial for the exercise of his constitutional right to remain silent after arrest. *Doyle v. Ohio*, 426 U.S. 610, 618, 96

S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Braden v. State*, 534 S.W.2d 657, 661 (Tenn. 1976). Generally, the prosecution may not comment at trial that a defendant invoked the right to remain silent in the face of accusation. *Braden*, 534 S.W.2d at 660; *Ware v. State*, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978). However, a comment on a defendant's silence may be harmless error that does not require a mistrial. *See Honeycutt v. State*, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976).

> During the state's rebuttal argument in this case, the prosecutor said
> Now, [K.H.] and [A.H.] both came and they testified . . . . And think about the defendant's actions after this happened, after Katrina died from her injuries at the MED, and he's brought down to the Homicide Office and questioned by Sergeant Caroline Mason in a large interview room.
>
> What does he do? He doesn't give a formal statement because he knows - -

At that point, the defense requested a bench conference. The court ruled that the prosecutor could continue her statement because "[the defendant] made some kind of oral statement[,] [s]o I don't think she's overstepped her bounds at this point." The defense moved for a mistrial based on "the [s]tate commenting on his exercising his Fifth Amendment [r]ight not to give a statement." The court denied the motion, finding "that the defendant has not been prejudiced by what the [s]tate said. . . . [S]he was referring to some oral statements . . . ." The prosecutor chose not to continue her statement.

The defendant contends that the prosecutor's comment penalized him "by contrasting the willingness of the [s]tate's witnesses to give pretrial statements to [his] silence." However, Sergeant Mason testified that, while the defendant was in custody and after she gave him a *Miranda* warning, the defendant said "that he had seriously messed up" and "that [she] knew very well that he didn't need to give a statement because his butt was going to rot in jail." Based on the sergeant's testimony, we conclude that the defendant did not remain silent while he was in custody; he merely refused to give a formal written statement. *See State v. Newsome*, 744 S.W.2d 911, 918 (Tenn. Crim. App. 1987) (holding that the state did not deliberately comment on the defendant's invocation of his right to remain silent when the state elicited testimony from a police officer that the defendant gave oral statements rather than written statements). In light of the fact that the defendant did not remain silent, but rather gave an inculpatory oral statement to the investigating officers, the defendant's argument fails. *Id.* He has not proven that the prosecutor made an improper comment or that the trial court abused its discretion in refusing to grant a mistrial. He is, therefore, without relief as to this issue.

**Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.


_____
J.C. McLIN, JUDGE